[No. 37920.   Department Two.   May 5, 1966.]

WESTERN STEEL BUILDINGS, INC., *Respondent*, v. UNIVERSAL CARLOADING & DISTRIBUTING CO., INC., *Appellant.**

*Murray, Scott, McGavick & Graves*, by *E. M. Murray*, for appellant.

*Rutherford, Kargianis & Shinn* and *Samuel C. Rutherford*, for respondent.

DONWORTH, J.—This is an action brought by respondent, Western Steel Buildings, Inc., as consignee, to recover damages to a prefabricated steel building sustained while in transit. The defendant (appellant) is Universal Carloading & Distributing Co., Inc., a freight forwarder, which is in

*Reported in 413 P.2d 954.

the position of a common carrier in interstate commerce for purposes of this action. The trial was before a court without a jury. The court made findings of fact and conclusions of law on which it based its judgment awarding $3,699.72 damages to respondent. Universal Carloading & Distributing Company, Inc., appeals from the judgment.

The pertinent facts in the case are that, in May, 1961, respondent was consignee of a prefabricated steel building manufactured in Birmingham, Alabama by Butler Manufacturing Company, which respondent had purchased at a price of $3,699.72 f.o.b. Birmingham. The ultimate destination was Anchorage, Alaska, where respondent is the distributor for "Butler Steel Buildings."

The building was ordered by respondent to fulfill a contract between respondent and Anchorage Electric Company whereby respondent agreed to erect a 40'x40'x20' steel building according to certain specifications to be used by the electric company for a combination warehouse and office. These specifications included special steel parts so that the building would conform to the building code requirements of the city of Anchorage pertaining to "roof load" and "wind load" strengths. The concrete foundation was being laid when the building was shipped from Birmingham, and the superstructure was to be completed not later than August, 1961.

The evidence at trial showed that the component parts of the building were loaded on an open-top van by Butler Manufacturing Company at Birmingham and were transported by Alabama Highway Express to Memphis, Tennessee, where the parts were loaded in a railway boxcar of the Union Pacific Railroad, and transported to Seattle. The boxcar arrived in Seattle on June 7, 1961, and was delivered to the Alaska Steamship Company pier for transshipment to Anchorage.

An employee of Alaska Steamship Company then opened the car, apparently preparatory to loading the component parts on board ship. The shipment was found in a damaged condition. Alaska Steamship Company contacted respond-

ent consignee in Anchorage directly by telephone to advise respondent of the damage and the need for inspection of the shipment and "notation of damage" before it would be accepted by Alaska Steamship Company for transshipment to Anchorage.[1]

Respondent's sales manager then telephoned from Anchorage to Arthur W. Schroeder, who was the Butler Manufacturing Company's representative for the Pacific Northwest. Mr. Schroeder has a degree in civil engineering, and had worked for Butler Manufacturing Company for about 7 years before opening his own business as a distributor-builder for Butler buildings in the Seattle area. Respondent requested Mr. Schroeder to act as agent for Western Steel Buildings, Inc., for the purpose of inspecting the component parts of the building to determine if the shipment should be transshipped to Anchorage. Mr. Schroeder then went to the Alaska Steamship Company pier, where he met employees of Alaska Steamship Company and employees of appellant Universal Carloading & Distributing Company, Inc., with whom he thereafter inspected the component parts of the building as they lay in the railroad freight car.

Mr. Schroeder testified substantially as follows: The building parts lay in the car in jumbled disarray and the inspection was difficult because he could view only the items which were on top. He climbed into the freight car

---

[1]We note in passing that it appears from the record that *usually* a carrier simply notes the damage at the time cargo is transshipped without requiring an inspection by the consignee. The record does disclose that Alaska Steamship Company refused to transship unless consignee's approval of transshipment was obtained. Respondent's attorney stated this proposition in his opening remarks at trial, and appellant's counsel insisted that Alaska Steamship Company had not refused to transship. Nevertheless, it appears that Alaska Steamship Company was unwilling to take the risk that delivery of the shipment might be refused by respondent in Anchorage. No other explanation appears in the record, and—although Alaska Steamship Company did not categorically refuse to transship—it insisted that before receiving the damaged building parts for shipment from Seattle to Anchorage, it must have consignee approval as assurance that delivery would be accepted by respondent at Anchorage.

and, together with the men from appellant company and Alaska Steamship Company, looked over the building parts as well as he could in the loaded car. He noted that some of the structural members of the building (frame) were damaged, apparently because they had been sliding around in the freight car on top of the lighter materials and bundles of wall and roof panels and other component parts, breaking open the bundles, bending the ends of panels, and scattering the packaged parts like an opened deck of cards.

He stated that he had asked one of appellant's employees to spread the shipment out in the open for his inspection, but the employee refused to do so. He stated that thereafter he felt, because of the very extensive damage he had viewed in the course of this inspection, he had no choice but to reject the shipment on behalf of respondent. He was of the opinion that the building was substantially destroyed. He rejected the shipment, and thereafter advised respondent of his opinion as to the extent of the damage and of his rejection of the shipment.

Mr. Charles Houser, who was the local manager for appellant at the time of trial (he was sales manager at the time of the inspection in June, 1961), testified in substantial contradiction to Mr. Schroeder. He stated that the component parts of the building were held securely in place within the railroad car by blocks. He was certain that the blocks were still in place and that, in his opinion, there had been no slippage of the load in transit in the freight car. He also stated that Mr. Schroeder had rejected the shipment without more than a cursory inspection, and that Mr. Schroeder had refused to have the shipment laid out for his detailed inspection. Mr. Houser stated that he had proposed such inspections so that if any parts of the shipment were undamaged they could be shipped to Anchorage and the damaged or missing parts could be repaired or replaced.

Thereafter, in June, 1961, respondent reordered the building from Butler Manufacturing Company, and the second prefabricated building was shipped without mishap to Anchorage, where it was erected. Respondent paid Butler Manufacturing Company for both buildings, and paid appel-

lant the freight charges for the second shipment but refused to pay those for the first shipment.

On July 12, 1961, after the second building had been ordered, but before it was received in Anchorage, respondent filed a claim with appellant for the total value of the first building. The claim was rejected by appellant by letter on August 1, 1961, on several grounds, among which was the defense that the building was not totally destroyed, and could not be abandoned with them by the consignee.

In the interim, appellant had moved the railroad car to its own warehouse area and unloaded the component parts, placing part of them inside a warehouse and part of them outside a warehouse but under a roof. These parts remained there for some 10 months, until the following April (1962), when they were inspected in detail by Mr. Schroeder, and by Mr. Robert Flory, who was employed by appellant to make a complete detailed survey of the shipment, and to determine the amount of damage or loss and the cost of repair, if repair were feasible.

Mr. Flory was a construction superintendent for Hallidie Builders (a division of Hallidie Machinery Company, Inc.) at the time this inspection was made. He was very familiar with Butler buildings because he had not only supervised their construction while working for Hallidie Builders, but he also had previously worked for several years for Griffin Construction Company, when that company did much of the work of erecting Butler buildings for Hallidie Builders. At the time of trial, Mr. Flory was a self-employed construction contractor in the business of steel fabrication.

Mr. Flory, Mr. Schroeder, and a laborer-helper from Hallidie Builders examined the shipment at appellant's warehouse in late March or early April, 1962. Mr. Flory testified substantially as follows: He used a packing list which the manufacturer enclosed with the shipment to determine the kinds of parts and the exact number of each kind included in the shipment. He listed every damaged or missing part.

The list of damaged or missing parts was incorporated into a letter written by Mr. Flory to Mr. Doane (president

of respondent company), in which he stated that the damaged material listed therein could not be repaired. The letter then stated that the balance of the structural steel (not listed as damaged) needed repainting because of damaged paint. Mr. Flory's employer, Hallidie Builders, offered to take the building to their place of business and have the scarred but otherwise undamaged structural steel repainted for a sum of $621, and to repackage the shipment for transshipment for $400. In effect, the salvage costs of the undamaged portions of the building were stated by Mr. Flory to be $1,021. This letter is an exhibit in the trial record.

In response to appellant's interrogatories, a price list of Butler Manufacturing Company, effective April, 1962, was supplied by respondent. The testimony at trial by Mr. Flory indicated that the prices in that list were not more than one or two per cent above the June, 1961 prices on those items on which the price had been increased. The testimony did not disclose exactly which prices might have been higher.

Although this price list was not introduced into evidence by either party, counsel for appellant propounded questions to Mr. Doane based on the total value of damaged or missing parts. Mr. Doane testified that these parts were worth about $2,600. Appellant's counsel asked a hypothetical question based on a value of $1,551 for the damaged or missing parts. Neither party had offered any evidence to support the hypothetical. Apparently, both parties were aware of the price list and another computation contained in the answers to the interrogatories, and each was willing to have the trial court consider the answers to the interrogatories as the basis for the hypothetical and in the deciding of the case. The interrogatories and answers are in the transcript on appeal.

It is very simple to make a mathematical computation of the total value of the damaged and missing parts from the answers to the interrogatories. A cross reference between the manufacturer's price list and the list of damaged and missing parts prepared by Mr. Flory showed that parts

worth about $1,550 were irreparably damaged or missing. When this figure is added to the $1,021 expense of the painting of the relatively undamaged but scarred parts, plus the packaging for reshipment, the total damage is $2,571, or about 70 per cent of the value of the shipment f.o.b. Birmingham, Alabama. If, on the other hand, the value of the damaged or missing parts is approximately $2,600 as stated in Mr. Doane's testimony (which figure is supported by a copy of exhibit No. 5 with the price computation given in the answers to interrogatories), the total value of the repair of the damage would be $2,600 plus the salvage cost of $1,021, or $3,621. This is about 97 per cent of the value of the building f.o.b. the factory.

Mr. Doane further testified that this was a specially designed building, that it was the only one he had sold in the several years he had been the Butler Manufacturing Company's sales and building representative in Alaska, and that he did not believe that he could find any buyer for this building in Alaska or elsewhere if it were repaired.

Mr. Doane's testimony was substantially supported by Mr. Flory's earlier testimony. It is clear from the record that Mr. Flory considered the building to be worth relatively little in Seattle in its damaged condition, and that its market value in Seattle, even if repaired, would be less than the price f.o.b. the factory in Birmingham.

On September 6, 1963 (2 years, 3 months after the shipment arrived in Seattle) appellant employed Mr. Trygve Bjornstad to inspect the building at its warehouse. He is a civil engineer, and is a partner in the structural engineering firm (consulting engineer) of Anderson, Bjornstad and Kane. He has been in the field of structural and civil engineering since about 1941. The nature of his work is the designing of buildings.

He testified substantially as follows: That he had inspected the building at the time of his employment to determine the extent of the damage. He described the building as damaged somewhat, but he expressed the opinion that the majority of the damaged parts could be repaired, and that relatively few of them (about $20 worth of parts) had

to be replaced. He testified in some detail from his notes as to particular parts which were damaged and the extent of the damage. He stated that he assumed that the parts were available locally, but he did not know. He estimated the cost of repair at between $500 and $800, and the market value of the building, before damage and after repair, at between $3,000 and $4,000. He expressed the opinion that the value of the building in its unrepaired condition was the undamaged market value, less the estimated cost of repairs.

He admitted, on cross-examination, that he did not know the prices of the component parts of Butler buildings and had never before appraised a damaged Butler building. He stated that his opinion of cost and value was based on his knowledge that such building, when erected, would cost about $3 to $3.50 a square foot. He also admitted that he did not know or have any way of knowing how many parts were missing, or their value, and that he had no recollection of certain parts, such as a door, a door frame, gable angles, eave corner closures, base angles, a ridge sag channel, and brace rods. He did not recall seeing any of these items (he was doubtful as to what some of them were, and their purpose, although he understood the use of others), and he did not recall that any of them were damaged, if they were there.

It is clear that Mr. Bjornstad did not include any value for missing items, or any of the above items, some of which were claimed by respondent to be damaged, and he could not say that they were either missing or undamaged (he could not contradict Mr. Flory's testimony or letter) because he had not had a copy of the building plan or a packing list from which to check each item. He also stated that he had not unstacked each wall panel and inspected it individually, but had inspected them as they lay stacked. In his direct testimony he had estimated that about 40 per cent of them were damaged. Mr. Flory's earlier testimony and exhibit No. 5 indicated that 34 of the 52 wall panels were damaged.

In so far as the testimony of Mr. Schroeder and Mr. Flory on respondent's side, and that of Mr. Houser and Mr. Bjornstad on appellant's side, is in conflict about the extent of damage, it is relevant to note that the trial court, after hearing this testimony toward the end of the trial, viewed the component parts of the building at appellant's warehouse. It is also important to note that many of the damaged parts were essential parts to the building.

The trial court made findings of fact and conclusions of law in favor of respondent and gave judgment for the value of the building f.o.b. the factory—$3,699.72. The trial court dismissed the counterclaim of appellant for shipping charges of $999.72 and storage charges of $6,312.60.

Appellant has made six assignments of error which raise three issues:

(1) Did the trial court apply the correct rule to determine whether the consignee could reject the shipment?

(2) Does the evidence show total damage?

(3) Is the carrier entitled to shipping and storage charges on the goods which were abandoned in its care?

Respondent, appellant, and the trial court agree that the general rule applicable to this case is stated in 13 Am. Jur. 2d, *Carriers* § 427, pp. 904, 905. It reads:

> The obligation of the consignee to receive goods carried is not affected by the circumstance that they may have been injured or damaged during transit. So long as they retain a substantial value, the consignee is bound to accept them and can hold the carrier responsible only for the actual damage. This is on the theory that it is not only the moral but the legal duty of a party who seeks redress for another's wrong, to make use of every opportunity to lessen the damage caused by the other's default. However, where the injury destroys the entire value of the goods, and is equivalent to a total loss, the consignee may lawfully refuse to receive the goods and hold the carrier for their value, for in that event nothing that the consignee can do will lessen the loss and so diminish the carrier's liability. Moreover, even where a consignee wrongfully refuses to accept delivery of goods from a carrier because of damage to them in transit, he may nevertheless recover from the carrier damages for the

injury done to the goods, by an action either ex delicto or ex contractu.

This rule is cited by appellant in its brief on appeal, after which appellant argues that the trial court did not apply this rule but, instead, applied a rule that, if the consignee's agent believed as a reasonably prudent man that the shipment was so substantially damaged as to be worthless for the purpose for which it was intended, then the consignee was justified in abandoning the goods, and could recover the full value of the goods. Appellant contends that the test is not whether the consignee's agent believed the shipment was "totally damaged" but whether in fact it was totally damaged.

The trial court's finding of fact No. 5 reads:

That said shipment was damaged during transit, which damage was the responsibility of the defendant and was noted upon arrival of said shipment in Seattle, Washington on June 7, 1961. *The damage was examined by the plaintiff who determined the shipment was so substantially damaged as to render the shipment worthless for the purpose for which it was intended,* and that the plaintiff thereupon abandoned the shipment with the defendant. That although the entire shipment was not damaged, *the plaintiff's agent was acting as a reasonably prudent man in making his determination and was therefore justified in abandoning the shipment with the defendant.*

That the plaintiff thereupon made a claim for loss and damage against the defendant in the sum of $4,439.66. (Italics by appellant.)

The italicized portion of the above finding is that which appellant contends supports its position that the trial court applied the incorrect rule.

Unfortunately, the trial court did not make any formal statements of law on this point in its "conclusions of law." Instead, its legal premises are inherent in its two conclusions of law, which read:

I. That the plaintiff should be entitled to judgment in the amount of $3,699.72 against the defendant.

II. That the cross-complaint of the defendant, for freight charges and for storage should be dismissed.

■ The trial court's oral opinion reveals that it did accept the rule as stated by 13 Am. Jur. 2d, *Carriers* § 427, but that it considered the rule to be very difficult to apply to a situation where the shipment was an integrated unit (though disassembled) which had little or no value if it could not be used for the purpose for which it was originally intended by the consignee. The trial court distinguished this shipment from "divisible" shipments, some portions of which might be used, and from readily repairable machinery for which parts are easily obtainable and for which repaired machinery there is an available market. The trial court also noted that the consignee faced various alternatives and that the *value* of the shipment had to be viewed from the consignee's position. Then the court stated that the shipment in this case could be a total loss in the sense that it had no substantial value to the consignee because the consignee could not use it in its present condition nor could he repair it or resell it to anyone else. The trial court also noted that the consignee ran the risk of losing its present customer if it were delayed in performance of its contract by unsuccessful attempts to repair or replace parts, and that the consignee was working against a time schedule in the erection of the building.[2]

---

[2]Appellant argued at trial that the time for respondent's performance cannot be considered because appellant carrier was not advised of the need for delivery at any particular time. Hence, damages for delay cannot be claimed. Respondent argued that the time was relevant in determining if the building was usable, reparable, or the parts replaceable, even though the carrier was not advised of the time schedule for respondent's delivery to its customer because the damage for which the carrier is responsible created the time problem—and the necessity of deciding the question of the present value of the building in its damaged condition. We believe that the question is not whether the undamaged building must be accepted if delivered later than the respondent had expected, but whether there is *sufficient time to try* to repair or replace the damaged parts where it appears that the parts are irreparably damaged, and irreplaceable, based on present knowledge. The question pertains to the usefulness, and therefore the present value, of the building in its damaged condition. The trial court accepted this view. Although it has not been specifically argued on appeal, this issue is inherent in the opposing arguments of the two parties, when appellant insists upon a numerical count of parts or a dollar determination as to

The question of the value of the building in the view of the trial court was, therefore, one of business judgment. The trial court stated, after a review of the above factors:

[B]ased upon all these factors, did Mr. Schroeder make a determination that a reasonably prudent man would have made at that time, that this shipment did not retain a substantial value to consignee [?] . . . [I]t seems to me that this is the only way to apply the rule and still have it conform to what seems to the Court to be ordinary, reasonable, logical business standards that would be fair to the shipper, fair to the carrier and fair to the consignee.

It appears to this court that the trial court was not asking what did Mr. Schroeder "believe"—but rather—was he *justified* in his belief under the rules relating to the determination of value applicable to this kind of case. The language of finding of fact No. 5 is not to be recommended because the term "reasonably prudent man" introduced an irrelevant and misleading terminology in the finding, but the oral opinion shows what the trial court meant by this language, namely, that respondent's agent had to use sound business judgment supported by the facts.

The trial court thereafter referred to Mr. Flory's and Mr. Schroeder's testimony that, considering the building as an over-all unit, it retained no substantial value, and stated that the court considered this to be the fact.

We have read a number of cases cited by both parties, and cases cited in support of the text in 13 Am. Jur. 2d, *Carriers* § 427. We believe that the trial court's view that these cases did not entirely resolve the problem in this case is accurate. The trial court's view of the intricacy of the determination of the "value" of the shipment as the term is used in the general rule is correct. Few cases state a comprehensive rule applicable to the question of how value is to be determined. Two cases appear to include the kind of considerations which the trial court relied on in this case.

---

the value of the damaged parts, without consideration of the question of whether they would be of any use to the consignee in their present condition.

In *Crinella v. Northwestern Pac. R.R.*, 85 Cal. App. 440, 448, 259 Pac. 774 (1927), the opinion states:

> Where a shipment, however, is damaged to the extent that it is practically valueless, having regard to the expense of acceptance and use and to the purpose for which the shipment was intended, the consignee may reject.

In *Thomas, Badgley & Wentworth Mfg. Co. v. Wabash, St. Louis & Pac. Ry.*, 62 Wis. 642, 646, 22 N.W. 827 (1885), the appellate court reviewed the evidence, which was in conflict, and stated:

> It appeared that some of the most expensive parts were missing, and in the state of the proof the jury might well find, as they did, that the cost and expense to the plaintiff at the time to have the machine repaired by the manufacturer, and the broken parts replaced, would be as much as the price of a new machine.
>
> It is very clear that the machine in its damaged condition was of no value to the plaintiff. It was not a case of a partial but of a total loss, so far as plaintiff was concerned.

It appears to this court that the trial court applied the rule of the *Crinella* case, *supra,* and the reasoning of the *Thomas, etc. Mfg. Co.* case, *supra,* to the present fact pattern.

What the trial court had in mind was that the general rule provides sufficient leeway in the term "equivalent to a total loss," that a consignee is not under any obligation to attempt to salvage the shipment when it appears that the cost of the salvage, in order to make the shipment usable or salable, is reasonably likely to approximate (or even exceed) the value of the original shipment. The rule allows the consignee to use his business judgment, and if it appears to the trial court that the proof shows the consignee's judgment to be correct, then it is not necessary for the consignee to prove that the shipment retained no value to anyone. A showing by the carrier that the shipment retained some undetermined value in its present condition to some undetermined potential purchaser, is not an adequate defense to the claim by the consignee for the total value of

the shipment. The first issue raised by appellant is without merit.

It appears to this court that the trial court weighed the evidence according to the above discussion of the law and that it found that the building had no substantial value to the consignee. There is substantial evidence in the record to support this finding. Where a finding of fact is supported by substantial evidence, this court cannot substitute its own finding for that of the trial court, even though we might have made a different finding of fact were we the trier of the fact. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959). The trial court's finding of fact No. 5 must, therefore, be accepted as a verity. The other assignments are, for this reason, not material to the resolution of the case.

It follows from what has already been said that the dismissal of the counterclaim of appellant carrier for shipping and storage charges must be affirmed.

Since we find the assignments of error made by appellant to be without merit, the judgment of the trial court is hereby affirmed.

ROSELLINI, C. J., WEAVER and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.